1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

2

3   _____

4   UNITED STATES OF AMERICA,

5        Plaintiff,              Criminal Action No.
                                    1:24-cr-10001-LTS-2

6      v.

7   AIZAVIER ROACHE,

8        Defendants.

9   _____

10

11    BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

13                   SENTENCING

14

15            Thursday, February 6, 2025
                11:01 p.m.

16

17

18

19

20

21   John J. Moakley United States Courthouse
   Courtroom No. 13
22   One Courthouse Way
   Boston, Massachusetts

23

24   Rachel M. Lopez, CRR
   Official Court Reporter
25   raeufp@gmail.com

1                        **A P P E A R A N C E S**

2

    On behalf of the Plaintiff:

3

        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
4       BY:  LUKE A. GOLDWORM
        John Joseph Moakley Courthouse
5       One Courthouse Way, Suite 9200
        Boston, Massachusetts  02210
6       (617) 748-3621
        luke.goldworm@usdoj.gov
7

8

    On behalf of the Defendant:
9

        FEDERAL PUBLIC DEFENDER OFFICE
10      BY:  JOSHUA HANYE
        51 Sleeper Street
11      Fifth Floor
        Boston, Massachusetts  02210
12      (617) 223-8080
        joshua_hanye@fd.org
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  The United States District Court
 4      for the District of Massachusetts is now in session, the
 5      Honorable Leo T. Sorokin presiding.
 6              THE COURT:  Please be seated.
 7              THE DEPUTY CLERK:  Today is Thursday, February 6,
 8      2025, and we are on the record in criminal case number
 9      24-cr-10001, the United States versus Aizavier Roache.
10              Will counsel please state your name for the record.
11              MR. GOLDWORM:  Good morning, Your Honor, Luke
12      Goldworm for the United States.
13              THE COURT:  Good morning.
14              MR. HANYE:  Good morning, Your Honor, Josh Hanye
15      for Mr. Roache.
16              THE COURT:  Good morning.
17              Good morning, Mr. Roache.
18              MR. ROACHE:  Good morning.
19              THE COURT:  Okay.  So we're here for Mr. Roache's
20      sentencing.  I have the presentence report, revised
21      February 3rd, the defendant's sentencing memorandum,
22      exhibits, and the government's sentencing memorandum and
23      exhibits.
24              That's everything, right?
25              MR. GOLDWORM:  Yes, Your Honor.
```

1          MR. HANYE:  Yes, Your Honor.

2          THE COURT:  Okay.  I thought what I'd do is run

3     through the guideline calculations, as they do address the

4     various objections.

5          Yes, do you have something else?

6          MR. HANYE:  Your Honor, I do have a procedural

7     objection to one of the government's arguments that I want to

8     raise first.

9          THE COURT:  Sure.

10         MR. HANYE:  So the government's arguing for an

11    additional four-point enhancement, under 2K2.1, I think it's

12    (b)(6)(B), in connection with another felony offense.  The

13    procedural objection is that there was no objection lodged

14    based on this, so that violates Rule 32.  It violates the

15    rules, the Court's procedural sentence at the sentencing

16    order.

17         And in this particular case, we, Mr. Goldworm and

18    I, actually discussed what the government's position was

19    going to be on the guidelines.  And I will say that there was

20    a lot of back and forth and cooperation and collaboration

21    with probation in producing what became the initial

22    presentence report, but the government indicated to me that

23    they were not going to pursue that guidelines objection that

24    they now are pursuing.

25         And ultimately, the sentencing memo was filed just

1    two days before sentencing, and so that particular

2    combination, I think, did fairly raise the issue for

3    Mr. Roache.  And so I would ask the Court to not even

4    entertain it for those reasons, because it's been waived

5    under those particular facts.

6              THE COURT:  Anything you want to say?

7              MR. GOLDWORM:  Your Honor, I will fall on the sword

8    on this one, I think, as appropriate.  Between the initial

9    PSR, where --

10             THE COURT:  The draft PSR?

11             MR. GOLDWORM:  The draft PSR, yes, Your Honor, and

12   the final PSR, I had submitted to probation a supplemental

13   statement of offense conduct to try to include these

14   additional points for consideration.  When those points --

15   when probation, essentially, said it doesn't persuade them

16   one way or the other to move the needle, at that point the

17   government did -- made no additional efforts here.

18             And as Mr. -- or Attorney Hanye and I were going

19   back and forth, and at one point I had said, as he rightly

20   says, I'm not going to jump up and down about these

21   additional four points.  And the more I put together the

22   sentencing memo, despite the fact that the government's

23   recommendation is still in the original guidelines, it's not

24   based on the additional four points, it's still within the

25   guidelines as set out by probation, I did reference, because

1    I do think that there is evidence to support that it is the

2    right additional four points.

3              I understand the procedural error.  And to that

4    discrepancy, Your Honor --

5              THE COURT:  So let me say this.  First, kudos to

6    Mr. Goldworm for being honest about it, and just, like, it is

7    what it is.  And you're not sitting here -- some lawyers

8    might tell me, "Well, actually, Judge, I'm entitled to do

9    it," even though you're not, whatever, and some -- so kudos

10   to you for to that.  It's always a pleasure when people are

11   just forthright and confront the issues, and I appreciate

12   that.

13             Second, I will say two things.  I think it is late.

14   I think you're ordinarily supposed to make objections in

15   response to the draft PSR.  I assume they didn't include it

16   in the draft PSR.  I don't see the draft, so I don't know.  I

17   assume not.  So I think that's the time to do it.

18             I think that the circumstances that Mr. Hanye

19   raises, that sometimes that people make it after the final.

20   You get it a week or two before the sentencing, it's like,

21   okay, it should have been earlier, but we should decide

22   things on the merits, and what's the difference.  It is

23   tougher when it's two days before.  That said --

24             So, one, it's kind of moot, because I did it

25   consider on the merits.  I'm not persuaded.  And so there

1   isn't going to be a four-point enhancement.

2           And I think the facts that you presented -- your

3   objection is to the -- his -- to me ruling on the merits, I

4   understand, of applying the four-point enhancement, not to

5   the information that he provides, most of which was in the

6   PSR, anyway.  And so I don't know whether I need to exclude

7   it on the merits, procedurally or not.  Because I will say,

8   one of the things that I was going to get to, I was going to

9   note that I thought it was late.  But in any event, I did

10  think about it, and I have not -- I'm persuaded by

11  probation's position on the four-point enhancement, in any

12  event.

13          Is that sufficient to resolve your procedural

14  objection, or do you want a more express ruling?

15          MR. HANYE:  Because I don't know what's going to

16  happen, and there's no plea agreement here, so there could

17  potentially be an appeal, I would request the Court make a

18  ruling on the procedural objection, on the argument that it's

19  been waived for the argument that I made already.

20          THE COURT:  I need to look at the rule to see

21  whether -- which part of Rule 32.1?

22          MR. HANYE:  Rule 32(f)(1), I think.

23          THE COURT:  Okay.  So I read the 14-day -- it's the

24  14 days, put in late under the 14 days.  Mr. Goldworm doesn't

25  contend otherwise.  I view that within that rule is an

1    implied -- you could get an extension -- well, obviously, you

2    could get an extension, if you asked for it in advance.  But

3    also, good cause could support this even after the fact.  And

4    I would think that there is a prejudice component, too,

5    depending on what it is, and how harmful it is.

6          Here Mr. Goldworm has been very candid and doesn't

7    advance any good cause as to why it is late.  So I think it

8    is late.  So therefore, I think it's procedurally -- so I

9    rule it out for two reasons.  One, I sustain the objection on

10   process.  I had -- though I had noted it, it was late, when

11   in my preparation of the sentencing, I didn't go back and

12   reread 32(f).  So I considered it on the merits.  And when we

13   get to it, I'll explain to you that -- I can just say now.  I

14   can skip it then.

15         I read the objection.  I read all the materials.

16   And I thought that probation's decision that the government

17   hadn't proved it by preponderance of the evidence was -- on

18   the different theories that you advanced, was correct.  And

19   so without the -- either there's two reasons for the

20   four-point enhancement not applying.  One is the process.

21   And even if I'm wrong about the process, I think probation is

22   correct on the merits, and I did consider that.  So -- okay.

23         Anything else before I just run through the

24   guidelines?

25         MR. HANYE:  No.  Thank you.

1          MR. GOLDWORM:  No, Your Honor.

2          THE COURT:  Okay.  So then I'm -- just for the

3    record, since now we've been talking about process, so my

4    understanding is that, in this case, like all cases --

5          By the way, you reviewed the presentence report

6    with your client, right, Mr. Hanye?

7          MR. HANYE:  Yes, Your Honor.

8          THE COURT:  That there was a draft report released

9    to all of you.  I don't see the draft report.

10         Then there was the January 30th presentence report,

11   final presentence report, that was released to me and to all

12   of you.

13         And then there was an addendum or revised

14   presentence report on February 3rd.  That's the one I'm

15   referring to.  It has very slight changes, which are noted

16   in -- on page 37.  So -- so that's the presentence report to

17   which I'm referring.

18         So the offense level was calculated this way.  And

19   I'll stop at each point.  Base offense level of 14 because of

20   the nature of the charge, and he, Mr. Roache, was a

21   prohibited person.

22         So then probation assessed a six-point enhancement,

23   under 2K2.1(b)(1)(A) for the offense involving 25 firearms,

24   but less -- more than 25, but less than 99.  And Mr. Hanye,

25   on behalf of Mr. Roache, objects to that.

1          So this is how I see that.  There are, concededly,

2     six firearms which Mr. Roache admitted to in the plea.  Those

3     are, I think, the one firearm from January 19, 2023, one

4     firearm from February 2nd, 2023, four firearms from April 25,

5     2023.

6          There are four more firearms that are not in the

7     indictment, but are described in the presentence report, and

8     there are, with detail, corroborating information about the

9     purchase by Mr. Brunson and the acquisition of those firearms

10    for Mr. Roache.

11         And so I take your objection to be a two-part

12    objection, Mr. Hanye.  Your first objection is it should just

13    be six firearms, which would be a two-point enhancement under

14    this guideline, instead of the six-point enhancement

15    probation applied.  That objection is overruled for the

16    following reason:

17         I think in the presentence report, the four

18    firearms from September 23rd are more than sufficiently

19    established by preponderance of the evidence and aren't

20    susceptible to, really, to the factual arguments that you

21    make, which are that either the -- arguably inconsistent, as

22    you put it, explanations by probation or some implied attack

23    on Mr. Brunson's credibility.  So that would mean -- so it's

24    at least a four-point enhancement, because that would be

25    eight guns.  And you conceded that if those four count, then

1     eight, and that would be four points.

2          So the first part of your objection is overruled

3     for the reasons that I've expressed and the reasons expressed

4     in the presentence report that probation says six points.

5          Then to get from the four-point enhancement to the

6     six-point enhancement requires consideration of the firearms

7     that Mr. Brunson described in his 2021 interview with ATF,

8     that he purchased and that he said that --

9          I think it was 24 firearms?

10         MR. GOLDWORM:  Uh-huh.

11         THE COURT:  That he said that he purchased and that

12    he sold to Mr. Roache.

13         So there are two parts, just to be complete, I

14    think, to your objection, Mr. Hanye.  One part is that then

15    those guns, those purchases are the kind of thing that can't

16    count at relevant conduct.  Or I take it that that's part of

17    your argument, within the meaning of the guidelines.

18         I overrule that.  I think that those purchases can

19    count, assuming that by preponderance they're proven.

20    They're the kinds of things that could count in the

21    assessment of the firearms.

22         The second part of your objection, essentially, is

23    the government hasn't produced enough evidence to connect

24    Mr. Brunson's purchase of those 24 to Mr. Roache, such that

25    they can be counted under the guideline.

1        I have one question before I resolve that, of you,

2   Mr. Goldworm.  Mr. Goldworm, in your memo, at -- I think it's

3   at page 2, you describe a little bit more detail about

4   what -- let me step back.

5        The presentence report says Mr. Brunson purchased

6   24 firearms in 2021.  ATF agents went to him in a voluntary,

7   consensual interview.  And in that interview, he

8   attributed -- he said he bought those guns, and he said he

9   sold them, bought them for and gave them to Mr. Roache.

10       In your memo, at page 2, you describe a couple of

11  additional facts, specifically that in -- that Brunson

12  explained that Mr. Roache would text him photos of the

13  firearms that he wanted, and they would then meet, and that's

14  when they would make the cash exchange.  And they met at

15  different locations.

16       And I'm wondering, are those statements that

17  Brunson made in 2021?

18       MR. GOLDWORM:  Yes, Your Honor.

19       THE COURT:  Okay.  That's what I thought, but I

20  wanted to confirm that.

21       So given that, I overrule the second part of your

22  objection, Mr. Hanye, because I find that that is --

23  Mr. Brunson made those statements to ATF.  I think the fact

24  that he described them occurring in a way that later occurred

25  in 2023, he said in '21 it went in a certain way, and in

1    2023, he said it went in the same way in 2023, at a later

2    time in 2023.  And they got forensic evidence that

3    corroborated that, the way it happened.

4         I think that's sufficient for a preponderance of

5    the evidence on the record before me.  And so I sustain --

6    I'm sorry, I overrule the objection.  And for that reason, I

7    apply the six-point enhancement of at least 24 or 25 -- more

8    than 25 firearms.

9         MR. HANYE:  So may I respond?

10        THE COURT:  Of course.

11        MR. HANYE:  The response I have is about what the

12   Court noted about firearm purchases in September of 2023 --

13        THE COURT:  Yeah.

14        MR. HANYE:  -- which I read the presentence report

15   as saying, in September 2023 is when the ATF became aware of

16   purchases from earlier in 2023.  So I'm looking at

17   paragraph 11.

18        I admit, I'm not seeing evidence of additional

19   transfers to Mr. Roache in September of 2023, just that

20   that's when they became aware of the --

21        THE COURT:  You're saying that the four firearms

22   that -- there's the six in the indictment.

23        MR. HANYE:  Yes.

24        THE COURT:  And then I identify, first, four more

25   from September 2023.  And you're saying --

```
 1              MR. HANYE:  Those are in the indictment.
 2              THE COURT:  Those are the four that are in the
 3    indictment.
 4              MR. HANYE:  From April of 2023.  Correct.
 5              THE COURT:  Is that your view, Mr. Goldworm?
 6              MR. GOLDWORM:  One second.
 7              Yes, Your Honor, those are some of the firearms.
 8              THE COURT:  Putting aside the 2021 firearms -- put
 9    them aside for the moment -- is your view that there's, in
10    2023, in the presentence report, there's obviously the one
11    firearm from January 19, 2023, and one firearm from
12    February 2nd, 2023, and four more from April 25th?
13              MR. GOLDWORM:  One of the -- so, Your Honor, one of
14    the firearms referenced here -- so there's -- there's
15    purchases in January 29th, 2023, but one of the guns
16    mentioned in paragraph 12 is purchased on January 19, 2023.
17    So that was one not connected to the purchases that were
18    charged, at the very least.  The rest I agree with Mr. -- or
19    Attorney Hanye, that the April ones, and certainly, I think,
20    the February ones, were connected.
21              THE COURT:  I see.  So the paragraphs 11, 12, and
22    13, you think, are referring to the six that are in the
23    indictment, plus one more?
24              MR. GOLDWORM:  Yes, Your Honor.
25              THE COURT:  Okay.  Then I stand -- I reconsider
```

```
1    what I said and reverse myself.  I misread that.  My
2    apologies.  And so then -- one second.
3            MR. HANYE:  But even -- I see evidence of six
4    firearms in 2023.  I don't see evidence of seven.
5            THE COURT:  I don't think it matters.
6            MR. HANYE:  Okay.
7            THE COURT:  Because if the -- it's a two-point
8    enhancement for three to seven firearms.
9            MR. HANYE:  Right.
10           THE COURT:  And so whether it's the six -- everyone
11   agrees it's the six.  The seventh one that Mr. Goldworm
12   identifies doesn't change the guideline range.  So, at least
13   at the moment, it doesn't matter.
14           You both agree with that?
15           MR. GOLDWORM:  Yes.
16           MR. HANYE:  I agree that there's no difference
17   between six and seven for the purpose of the guidelines, yes.
18           THE COURT:  You agree that, like, there isn't
19   another one in 2023?
20           MR. GOLDWORM:  Not that I'm aware of, Your Honor.
21           THE COURT:  Okay.  So your request I reconsider.  I
22   allow.  I reconsider.  I was wrong.  There's only six or
23   seven in 2023.  Either way, that's just a two-point
24   enhancement.  Then there's 2021, which --
25           Is there something that you want to say about that,
```

1    or no?

2              MR. HANYE:  Yes.  Is that the statement by the

3    co-defendant about providing 24 guns, prior to 2023, to

4    Mr. Roache?

5              THE COURT:  Yes.

6              MR. HANYE:  I think that's the core of the

7    government's evidence.  I do want to address that.

8              THE COURT:  Yes.  So this is paragraph 9.  As I

9    understand it, on August 5, 2021, right, the agents met with

10   Mr. Brunson, and he then told them that he purchased 24

11   firearms for somebody who he identified in the course -- they

12   identified as your client.  And the -- and what Mr. Goldworm

13   has confirmed -- you probably have seen the 302, I assume, of

14   that interview -- but that, at that time, he said that your

15   client would text photos.  In the interview he said that your

16   client had texted him photos of the firearms.  And so it's

17   that 24 that puts him over to the six.

18             MR. HANYE:  So I just want to address that the

19   24 -- and make my objection clear --

20             THE COURT:  Yes.

21             MR. HANYE:  -- to that, which is that statement

22   from the co-defendant is uncorroborated.  And because it's

23   uncorroborated, it's insufficient to meet the preponderance

24   of the evidence that the government bears.  And there's no

25   evidence of where that number came from.  Did Mr. Brunson

1    just make that number up?  Was he presented with this number

2    24 and he adopted it?  We have no idea.

3             It's not -- there's corroboration that Mr. Brunson

4    was purchasing firearms, because the agents got those forms.

5    But that's not corroboration that any other firearms, besides

6    the six that Mr. Roache pled to, actually went to Mr. Roache.

7    The fact that the co-defendant said that, that by itself is

8    just completely insufficient.

9             There's reasons to actually believe that that

10   statement wasn't reliable.  Because Mr. Brunson, after

11   talking to the ATF, then went and committed additional crimes

12   after that, that eventually got him charged.  So that's one

13   reason that Mr. Brunson is not liable.

14            The lack of any information about where that number

15   came from is another indication.  The fact that that number

16   is different than the number of firearms that he also

17   purchased, which was 46, which is also referenced in the PSR,

18   is another reason that that statement is insufficiently

19   reliable.

20            So there's just nothing else that corroborates that

21   statement.  That's the argument why --

22            THE COURT:  So you're saying, one, it's not

23   reliable -- it's not -- there is no other information that

24   verifies the assertion that 24 firearms went to your client.

25            MR. HANYE:  Exactly.

1          THE COURT:  That he bought more than 24, so he

2     was -- that would -- you say, suggest, that he's selling to

3     other people.  And he was -- he then committed further crimes

4     after that, the 2023 purchases.  And so those three things,

5     you say, make him unreliable.

6          MR. HANYE:  Exactly.  To meet the preponderance

7     standard.

8          THE COURT:  Right.

9          And there's no other -- the only other relevant

10    fact in your view is the fact that he then said it was your

11    client -- and I understand by your arguments, but that's in

12    the universe of facts; and that what he said about -- that

13    your client would text him photos.

14         MR. HANYE:  He said that, right.

15         THE COURT:  Yeah.

16         MR. HANYE:  But law enforcement got Mr. Roache's

17    phone in November of 2023.  If there was evidence of those

18    prior purchases, prior to 2023, prior to the charged ones, we

19    would know about that.  The fact that we don't have that

20    evidence suggests that there's an absence there, which is

21    another reason to question why, you know, the -- the

22    assertion that the government meets its burden here.

23         THE COURT:  What do you say?

24         MR. GOLDWORM:  Well, first, Your Honor, I point to

25    the fact that the ATF didn't go to Mr. Brunson in a vacuum,

1    in a magic vault.  The Boston, New England ATF, went to

2    Mr. Brunson in South Carolina, because the guns were coming

3    up here to Massachusetts to be used.  They didn't magic a

4    photo, produce a photo of Mr. Roache to show to Mr. Brunson

5    because Mr. Roache wasn't already on their calculation as the

6    person up here receiving the guns.  They had -- they

7    recovered them --

8            THE COURT:  So it seems a fair inference, if it was

9    Boston ATF agents, what you're saying is it's a fair

10   inference that these firearms were showing up -- at least

11   some firearms were showing up here.

12           But how do I know how many?  And how do I know --

13   and what, I understand -- I'm confident the agents wouldn't

14   fly to South Carolina for no purpose or for no reason.  They

15   would have had a reason.  And I presume they already had a

16   photo of Mr. Roache with them when they showed up to

17   interview Mr. Brunson.

18           But without more, their hunch, suspicion, what have

19   you, that ordinarily wouldn't be preponderance evidence,

20   without specifics.  I guess what --

21           MR. GOLDWORM:  Your Honor pointed to several

22   specific details of that conversation, which link to the

23   current conduct, identically so.  And I would take the

24   different -- a different view than Attorney Hanye, which is,

25   if they had 46 guns, the number 24 indicates that those were

1    the guns that he gave to Roache.  He could have said all 46.

2    He could have said -- to cover himself, he could have

3    picked --

4              THE COURT:  Did they know about 46 then?

5              MR. GOLDWORM:  I believe --

6              THE COURT:  Or 46 minus the ones in --

7              MR. GOLDWORM:  It might have been 46 minus -- I

8    stand corrected, Your Honor.

9              MR. HANYE:  We don't know.  I think unanswered

10   question ultimately mean that the burden hasn't been met.

11             MR. GOLDWORM:  I would continue, Your Honor, both

12   in 302s and in the detention memo filed by the Court, there's

13   a statement from Mr. Brunson in this interview that says, "I

14   only sold them to Mr. Roache.  I only sold guns to

15   Mr. Roache."

16             THE COURT:  Mr. Brunson said that when?

17             MR. GOLDWORM:  In the 2021 interview.

18             THE COURT:  I see.  So he said, in the 2021

19   interview, "I only sold to Mr. Roache.  He texted me photos.

20   He paid me cash.  We met in different places."  And the

21   corroboration that you say that comes from that, things that

22   corroborate it is, one, the reason that Boston agents went

23   there is because they were finding at least some guns that

24   trace back to South Carolina, to Mr. Brunson, up here; two,

25   they went down -- and, two, the later purchases went the same

1    way as those earlier purchases.  Mr. Brunson said that

2    earlier, not later.

3         And -- and the forensic analysis of the phone, is

4    there -- were there -- did the text -- it was text messages.

5    Is that the way they communicated?

6         MR. GOLDWORM:  Yes.

7         THE COURT:  Were the text messages recovered back

8    to 2021?

9         MR. GOLDWORM:  My memory is we did not have them

10   very far back in that -- including there was additional

11   comment that we would have liked to have proved, separate and

12   apart from 2021, that we were hoping would be in the text

13   messages, that was decidedly absent because the phone had

14   only fairly fresh content on it.

15        THE COURT:  I see.  So it didn't have -- so that

16   is, it didn't have 2021 content, showing texts between them

17   to arrange these purchases.

18        MR. GOLDWORM:  Yes.

19        THE COURT:  And it didn't have 2021 content that

20   didn't show it.

21        MR. GOLDWORM:  Correct.

22        THE COURT:  Anything else you want to say?

23        MR. HANYE:  If there's an inference that there's a

24   suspicion directed towards Mr. Roache when they go and

25   interview Mr. Brunson, because of the Boston connection, then

there's also an inference that Mr. Brunson would have been
motivated to limit the admission of his legal conduct to one
person and that he was motivated to not necessarily be
entirely truthful, to be what he thought he could be
partially truthful and reduce the consequences.  And the fact
that he continued to do this afterwards, just supports that
inference.

Again, it all comes back to the statement, and the
fact that Mr. Brunson said, "I only gave them to Mr. Roache.
That, itself, is also insufficiently reliable for those
reasons.

One last thing that I would add, that I didn't
address before, is just I need to respond to probation's
response to the objection, which included the argument that
there's no evidence that guns from Mr. Brunson went to
anybody else.  That is just an incorrect application of the
burden here.  That would shift the burden to Mr. Roache to
produce that.  So I just want to make sure that that's not
part of the Court's analysis.

THE COURT:  No, it's not.  The determination that I
make is we have a universe of factual evidence that's before
me.  Is that universe of factual evidence sufficient on a
preponderance to sustain the government's burden to seek the
enhancement?  Here we're talking about from two to six -- two
to six points.  Whether it's six guns or seven guns, I think,

1    in my view, doesn't matter in 2023 in terms of the guideline

2    calculation, because either, if 24 comes in, it's above at

3    six or seven.  And if it's not 24, it doesn't get there.

4    That isn't reliable.  So I decide that based on the universe.

5            And just to be clear, because the phone didn't go

6    back that far in time, I don't draw the inference that the

7    absence of inculpatory evidence means that undermines

8    Mr. Brunson's statement the way it would if the text

9    exchanges went back to 2020.

10           On the other hand, it doesn't prove -- there is no

11   affirmative evidence there that supports the application of

12   the inference.

13           Give me one second, because now you framed it, and

14   I'm tracking it a little more clearly than I had thought

15   about it before.

16           Okay.  I'm going to overrule -- I concede, it's a

17   somewhat close determination on a preponderance of the

18   evidence standard, but I'm overruling the objection

19   because -- for a couple of reasons.

20           One, Mr. Brunson, confronted, said it.

21           Two, I infer that there's evidence -- I infer that

22   the reason that Boston -- I'll start at the beginning.  I

23   infer there's -- some of these guns that Mr. Brunson

24   concededly purchased were ending up in Boston.  That's why

25   Boston agents went to South Carolina to interview

1   Mr. Brunson.

2           The fact that they were ending up in Boston doesn't

3   prove that Mr. Roache was the person who was getting them or

4   having them purchased for him, but it is a small -- it is a

5   relevant fact, and it tends to support that.

6           Second, Mr. Brunson, in his voluntary interview,

7   said that it was Mr. Roache and identified him from a

8   picture, and so forth.

9           Third, he described the way the purchases occurred.

10  And the way he described the purchases occurring is the way

11  that later, when they could corroborate it, that is when they

12  did corroborate the 2023 purchases, they happened that way.

13          And so that, under -- under the circumstances, I

14  think, is sufficient for a preponderance of the evidence

15  finding.

16          That said, the reason that I think it is close is

17  that there is -- are other facts that, to me, make it close,

18  which is that -- and Mr. Brunson said that they all --

19  everything that he purchased went to Mr. Roache.  And the

20  ones that make it, you know, close is that he later committed

21  a crime.  He committed a crime here, and he later committed

22  another crime, even after he was interviewed by ATF, which

23  causes some concern about Mr. Brunson's statements.

24          And I'm a little dubious that he didn't make any

25  money from purchasing all of these firearms.  I find that not

1    a credible statement.  If one firearm, I could see that, but

2    not so many different purchases.  And he's talking about it a

3    lot, so that calls into question -- that's why I think it's

4    close.

5            And so your rights are preserved as to the

6    objection.

7            So that, when it's all said and done -- I'll start

8    at the beginning, just to make it clear for the record.  So

9    it's a 14 base offense level.  Everyone agrees with that.

10   It's a two-point enhancement for six or seven guns.

11   Everybody agrees that's appropriate.  The dispute is whether

12   there should be an additional four points.  The only basis

13   for the additional four points is Mr. Brunson's statement to

14   ATF in 2021.

15           For the reasons that I just articulated, I'm

16   applying that extra four points, the 25 to 99 firearms,

17   affirming probation's view, overruling the objection --

18           The rights are preserved, Mr. Hanye.

19           That leads to a six-point enhancement under

20   2K2.1(b)(1)(A).

21           And then there's a four-point --

22           There's no enhancement for obliterated serial

23   numbers.  I agree with probation on that.  I don't think

24   there is any -- if there is an objection --

25           MR. GOLDWORM:  No objection.

1          THE COURT:  All right.

2          There's a four-point enhancement for trafficking in

3    firearms, 2K2.1(b)(5).  I think that applies whether we're

4    talking about six firearms or the larger number.

5          I don't understand you to be objecting to that,

6    right, Mr. Hanye?

7          MR. HANYE:  Correct.

8          THE COURT:  Right.

9          And then 2K2.1(b)(6)(B), I've already ruled on.

10   There's no enhancement applied by probation.  I agree with

11   them.  And I agree for the two reasons that I stated earlier.

12   That results in a final offense level, as set forth in the

13   PSR, of 21.

14         Saving your objection, but putting aside that,

15   given what I ruled, do you agree it's a 21?

16         MR. HANYE:  Yes.

17         THE COURT:  And then no dispute by anybody, this is

18   a Criminal History Category IV.

19         MR. HANYE:  Correct.

20         MR. GOLDWORM:  No, Your Honor.

21         THE COURT:  Okay.  And so that leads to a guideline

22   sentencing range of 57 to 71 months, one to three years of

23   supervised release, a 15 --

24         You're not asking for a fine, are you?

25         MR. GOLDWORM:  No, Your Honor.

1    THE COURT:  Well, it's a range of 15,000 to 150, if

2    he can afford to pay a fine.

3    Restitution -- there's no restitution that applies

4    here.

5    The mandatory special assessment of $100.

6    I'll hear from you, Mr. Goldworm.

7    And then from Mr. Hanye, and Mr. Roache, if he

8    wishes.

9    MR. GOLDWORM:  Your Honor, in this case, the

10   government is asking for 70 months of incarceration, followed

11   by three years of supervised release.  And the government's

12   argument is based on the ultimate menace to public safety

13   caused by the number of illegal guns being in circulation,

14   the totality of the circumstances, that complete narrative of

15   looking at this as more than just a transaction of firearms,

16   but the ultimate impact of those firearms in the community,

17   Your Honor.

18   The defendant, by putting that -- even the six guns

19   into the community, eroded the fabric of those communities by

20   putting people at risk and endangering people that are just

21   trying to go about their day, working an honest day for

22   honest pay, to go to school, and so forth, by injecting a

23   level of violence, by putting guns -- he, himself, is a

24   prohibited individual, but he's putting guns in other

25   people's hands.

1          And as Your Honor has noted prior, a firearm really
2   has a singular purpose, which is destruction, either serious
3   bodily injury or death.  And so the defendant, by his very
4   business, was a merchant of violence in this way.

5          And the -- the government touched on, when we were
6   talking about the enhancements, those two-dozen-plus guns
7   that enter from South Carolina to Massachusetts, the fact
8   that the ATF here in New England was seeing enough of a
9   pattern of these guns popping up that they went to South
10  Carolina to speak to Mr. Brunson, went to his door, says a
11  lot.

12         I think what says more is that the pair continued
13  this conspiracy of trafficking firearms after, essentially,
14  been given a hall pass or some sort of divine intervention
15  from the ATF saying, "Knock it off.  We know what you're
16  doing."  They said, "Mr. Roache is a felon.  He can't possess
17  a firearm.  Stop giving him guns."  And I think common sense
18  would imply that, if they're in this conspiracy together or
19  they're committing this, that Mr. Roache was aware that the
20  federal government was looking at them at some point in time.

21         Now, can I say that dispositively?  Of course not,
22  Your Honor.  But I think common sense would suggest that.

23         And yet, those guns continued into the hands of
24  people that would use them for violence.  And starting -- and
25  looking at attachment C to the government's memorandum,

1   Your Honor, you can look that within 15 days of one of these
2   guns being purchased, one of the guns in the indictment being
3   purchased, it's used.  It goes from South Carolina, up here.
4   It is used at a shooting outside the Dublin House in
5   Dorchester, in which two people were seriously injured and
6   went to the hospital, wounded, with injuries to their chest,
7   ankle, hip, and arms.
8          Forty-one days later, that gun is grabbed from --
9   by law enforcement in Boston off of a gang member.  It had an
10   extended magazine in it.  And that's a sampling that you can
11   see, Your Honor, from the attachments A, C, D, E and F of the
12   government's memorandum, in which firearms that start in
13   South Carolina, seemed to find their way into Massachusetts,
14   in hands, at crime screens.  Those include shootings, shots
15   fired, blastic damage, and so on.
16          And if you look at the fact that those are only
17   guns that law enforcement has been able to recover at scenes,
18   and then go back and link to incidents, any crime that's out
19   there, any of these firearms that are out there that haven't
20   been recovered, we don't know the impact at this point.  The
21   evidence submitted to the Court is based just on what we're
22   aware of at this moment in time.  And given the volume over
23   the years, it is terrifying what the potential damage could
24   be.
25          And Your Honor, as we look at here, the scope and

1    the breadth of what is potentially possible in terms of the

2    defendant's conduct, that collateral damage, is concerning.

3    But beyond that, then the defendant had made plans with the

4    co-conspirator to obliterate the serial numbers, quote, Make

5    them unrecognizable, because he didn't want those guns coming

6    back to him because he knew the choices he was making.

7         If those guns come back to him, one, he's

8    prohibited.  He shouldn't even have a firearm.  But if they

9    do come back to him, those guns, which would be used for

10    crime, threats of violence, carrying out of violence, will

11    come back to him.

12         And the people buying guns from Mr. Roache are not

13    going to gun stores.  There's a reason that they're buying

14    guns from Mr. Roache.  There's a reason that he wanted to

15    obliterate those numbers.

16         And the defendant himself has used a firearm, as in

17    32(a) in the PSR discusses, to threaten someone.  In his own

18    words, he talks about threatening someone with a firearm.

19         And more than that, we see, both in the PSR and in

20    attachment A of the government's memorandum, that he's

21    diversifying his enterprises; that there is evidence that he

22    is also involved in the drug trade.  Your Honor, he's --

23    there's quotes about him, "I'm out here selling crack."

24         There's -- he's in an incarcerative facility,

25    pending this case, and he's involved with drugs.  And I note,

1    in that particular instance, Your Honor, an inference could

2    be made, as he and the other detainee were disciplined

3    together, Mr. Roache admitted the possession of the drugs in

4    that incarcerative facilitate in Wyatt were his.  And when

5    both detainees were tested, Mr. Roache was clean for drugs,

6    but that other individual was -- had tested positive for the

7    drugs.  I think an inference could be made that the drugs in

8    the incarcerative facility were there for Mr. Roache to deal

9    them, hence why he didn't have any in his system, and the

10   other individual did.

11              THE COURT:  I found the other disciplinary report

12   more concerning.

13              MR. GOLDWORM:  I was going to get to that one,

14   Your Honor.

15              THE COURT:  All right.

16              MR. GOLDWORM:  And that speaks to the -- the place

17   we are now.  Because that incident, Your Honor, involves

18   Mr. Roache and another -- a number of other detainees

19   committing assault on someone else in the facility.  And

20   despite the fact that that individual, they targeted this

21   individual because -- without a shred of proof or any sort of

22   evidence, they decided that he may -- and I'll emphasize

23   "may" -- have cooperated in some court of law enforcement.

24   And in their code, in their law of the street, that was a

25   problem.  In the defendant's own words, that individual was a

1    Decepticon; he was a gangster gone bad.  And as a result,

2    they subjected him to a gang assault.

3            I think it's hard to look at the defendant's

4    conduct in this case as some sort of trite mistake or misstep

5    and more a life that he has chosen repeatedly, again and

6    again, starting from property and larceny crimes, when he was

7    a teenager, and progressing we're now in federal court on a

8    federal firearms trafficking charges.  And you would think

9    that this would be a moment for reflection and a time to

10   amend your life.  But he's in custody on this case, and he's

11   committed two disciplinary actions while in custody on this

12   case.  I find that deeply concerning.

13           The records -- his court interactions in three

14   states wasn't enough to dissuade him, certainly with him

15   being held in custody on something that has, potentially,

16   significant impact on his -- his life going forward would

17   have slowed him or demurred in some way from his conduct.

18   But it seems that the law that he respects is not the law of

19   the land but the law of the street.  And I think that's

20   evidenced in the action in Wyatt, where he -- he and the

21   other detainees came to their own decision about what to do

22   in that situation.

23           And so in -- to sum it up, Your Honor, I think all

24   of the 3553(a) factors lead to the -- a place where the

25   defendant's conduct has consistently and historically been

1  one that has endangered the public, has made this --

2  Massachusetts and the communities here less safe.  And he has

3  decided that the twin ills of drugs and guns are an

4  enterprise, a business of misery that he is -- he has carried

5  out, and seemingly without any sort of thought of the

6  implications or concern for that conduct, as he's doing the

7  same two things now in Wyatt.

8          So Your Honor, I think the government struggles

9  to -- here to find the appropriate sentence, but ultimately

10  believing that, in this case, having -- beginning with the

11  ATF's notification in 2021, that this -- this conspiracy of

12  firearms trafficking was problematic, and leading to the

13  charges here before the Court today, and all the collateral,

14  sort of, behavior of the defendant, the appropriate sentence,

15  it's a tough but fair sentence, and the government would ask

16  you to impose 70 months of incarceration and 36 months of

17  supervised release.

18          THE COURT:  Okay.  Thank you, Mr. Goldworm.

19          Mr. Hanye?

20          MR. HANYE:  Thank you, Your Honor.

21          Your Honor, we're maintaining our recommendation of

22  46 months of incarceration.

23          In light of the Court's findings as to the

24  guidelines, I would ask the Court to consider not more than

25  57 months, which is the low end of the guidelines that the

1    Court has found.  I certainly believe that 46 months meets

2    the statutory test of what's sufficient, but no greater than

3    necessary.  But I would alternatively argue that there is

4    nothing that should draw the Court above 57 months.  And

5    there's several reasons for that.

6            The starting point is -- for me, is that either

7    46 months or 57 months is a significant increase over any

8    prior sentence that Mr. Roache has previously received.  His

9    longest prior sentence was a year.  So we're talking about an

10    increase of either four times or five times, approximately,

11    his prior period of incarceration.

12            Such a big increase goes right to several of the

13    statutory sentencing factors.  It goes to deterrence.  It

14    goes to just punishment.  It goes to promoting respect for

15    the law.  Because when we're talking about that big of an

16    increase, it sends a message to Mr. Roache for all of those

17    reasons.  Those are -- those are the sending-the-message

18    factors, and either four times as much as he's previously

19    done, or five times as much as he's previously done

20    sufficiently accomplishes those.

21            There's -- I want to mention something that I

22    didn't mention in the sentencing memo, that goes directly to

23    how long Mr. Roache will be incarcerated on any number that

24    the Court gives, which is that he's got warrants in South

25    Carolina, which means that he's going to be ineligible for

1    any time at a halfway house.  So that is typically a

2    six-month period, where someone is out of the BOP and in the

3    community.  He's not going to be eligible for that.  So once

4    he's finished with whatever sentence the Court imposes here,

5    I expect he's going to have to go back to South Carolina.

6    Even if he's not extradited, he would be ordered to go there

7    on his own.  Either way, he's not going to get a halfway

8    house.

9         And I don't expect there would be a way for him to

10   resolve those cases while he's in custody.  So it's a

11   consequence that he created for himself, but it's one that is

12   appropriate and affects how much actual time he's going to do

13   in prison.

14        The other factors that I would point to, and which

15   I addressed in the sentencing memo, Your Honor, are his

16   background, and also the family support that he has now, that

17   goes -- his family background really cuts both ways, in that

18   it was a -- a great absence for him, great challenges, based

19   on his father's addiction and incarceration.  But he also

20   does have support on his mother's side of the family.  I

21   mean, what he's trying to do, what his family is trying to

22   help him do is to interrupt the cycle of negative

23   consequences that flow directly from a parental

24   incarceration.

25        His father died of fentanyl overdose.  He spent

1    much of Mr. Roache's time as a child incarcerated.  Even when

2    he was out, he wasn't particularly involved in Mr. Roache's

3    life.  And even when he was, he was a negative influence.

4         The presentence report, which includes information

5    from his mother, the letters of support that have been

6    submitted to the Court, all talk about how this pushed

7    Mr. Roache, at a very young, impressionable age, towards the

8    street, towards other negative influences.

9         None of that is an excuse, but it is something that

10   he is very concerned about, that he may be doing the same

11   thing to his child; that he's looking for a way to be able to

12   become present in his father's -- in his son's life, the way

13   his father wasn't in his.  And if he gets six years, as the

14   government asks for, that's much harder than if he were to

15   get four or five years.  And I think that's a factor that

16   should go to the Court's consideration of what's enough here.

17        In spite of that absence, of that harm that he

18   suffered, of the path that it put them on, which has resulted

19   in negative consequences for himself, he does have better

20   opportunities for the future.  He does have the opportunity

21   to have a much more positive relationship with his

22   stepfather, who has a very strong relationship with his

23   mother, who is employed as a truck driver, who wants to help

24   Mr. Roache find a career.

25        Mr. Roache, one thing about him is that he's a

1    worker, which, unfortunately, shows that he didn't have to do

2    the behavior here.  But he has opportunities for the future,

3    and I think being a truck driver is something that he's

4    interested in, something that he's got some access to.  And

5    his stepfather is more than willing to try to help him make

6    that a reality.

7            I also want to point out that two of the people who

8    wrote letters of support for him are here in court today, his

9    aunts, Vela Keaton and Lisa Delahunt.

10           THE COURT:  Welcome.

11           MR. HANYE:  We've had that same discussion about

12   the hard work that Mr. Roache actually has to do to make a

13   difference in the future.

14           So we understand, and he understands, that there

15   was harm here.  That was the basis of why, in our original

16   recommendation, we actually recommended the high end of what

17   I still think the correct guidelines should be.

18           THE COURT:  Uh-huh.

19           MR. HANYE:  But as the guidelines go up, it doesn't

20   necessarily mean the sentence has to go up.  Because all of

21   those factors get accomplished by all of that time in prison.

22           And ultimately, 46 months, with the supervised

23   release, is sufficient.  But, again, I don't think anything

24   longer than 57 months would meet the standard here,

25   Your Honor.

1              THE COURT:  Thank you, Mr. Hanye.

2              Mr. Roache.

3              MR. ROACHE:  Yes, sir.

4              THE COURT:  You have the right, if you wish, to

5    speak on your own behalf, say whatever you wish to say to me,

6    before I determine what sentence to impose.  You don't have

7    to speak, and if you want to remain silent, I won't hold it

8    against you.  But if you want to, now is the time to do so.

9              MR. ROACHE:  Yes, I will.

10             THE COURT:  Go ahead.

11             MR. ROACHE:  Your Honor, I would like to start off

12   by saying thank you for letting me accept responsibility and

13   speak on my piece and to come forward and accept

14   responsibility.  I would like to say that I'm disgusted in my

15   actions that I caused, and I didn't know that I was being a

16   part of an operation that was endangering the community.  All

17   I seen was the money side of this.  I didn't know -- I didn't

18   think about the harm I caused.  And in my heart, an apology

19   goes out to anybody -- that goes out to anyone that fell

20   victim to gun violence.

21             I would also like to apologize to my mother, who

22   did the best she could to raise me, and I let her down

23   because she never raised me like this at all.

24             I would also like to apologize to my son, who is

25   two years old of age, and it sucks that I can't be there for

him, to care for him, to nurture him.  And I'm just missing

so much time out of his life, and I only did it for a couple

of dollars.  And at the end of the day, none of it was even

worth it.

Growing up, I surround myself with the wrong crowd

of people.  I was easily influenced due to not having no male

figure around.  My father died from a fentanyl overdose, and

growing up, the only moments I had of him is just glorifying

the streets and negative acts.  This was the start of a new

life for me, because I looked up to him for all of the wrong

reasons.

I have a son now and a different outlook of life.

I want to be able to provide him with the best life ever, but

most importantly, protect him from any situation and actions

that may influence him to go down the same path that I went.

It sucks that I can't be there for him, and it's

actually killing me.  I can't be around for his wellbeing.

But as a man, I have to accept full responsibility for this.

I found out I have to want better and try better for the sake

of my life.

All my life, I was trying to find out who would

accept me or what crowd would accept me.  And the main thing

that I found out is the only person that I'm in competition

with each and every day is myself.  And I need to strive for

success, and everything else will fall in place for me.

1          My plans for the future is to work on myself.  My

2    stepfather wants me to work for his truck driving company and

3    help me get my CDL, so I can become a certified truck driver;

4    be a better role model for my son; and be able to put all of

5    this behind me, so I can move forward in life.

6          So once again, I would like to say, from the bottom

7    of my heart, I apologize to anyone who fell -- I apologize to

8    anyone who fell victim to any gun violence.  I apologize to

9    the state of Massachusetts, and to my family I let down with

10   my actions.

11         Thank you so much for letting me speak my piece,

12   Your Honor, and thank you for your time and consideration.

13         THE COURT:  Thank you, Mr. Roache.

14         So let me tell you a couple things, first,

15   Mr. Roache, before I deal with the sentence.  You have to

16   decide -- whatever I do here today, okay, you just have to

17   decide what kind of life you want to live.  All right?  And

18   that's really for you to decide -- not for me to decide, not

19   for Mr. Goldworm, not for Mr. Hanye.  You just have to decide

20   who you want to be and who you are.  All right?

21         It's your actions that largely define who you are.

22   Right?  So you -- right now, what your behavior has been

23   telling me is that -- I'll get to what you said, which I like

24   some of the things that you said, and I commend you for that.

25   But your behavior for what you're doing, it's telling me that

1    you want to go to prison.  Okay?  You're selling firearms.

2    You get into prison -- and I see a lot of cases.  I'm not

3    sure -- I see a lot of -- I sentence a lot of people.

4    Sometimes I see that their disciplinary reports for people in

5    there -- when they're at Wyatt or the other places that

6    people are detained.  But very rarely do I see a disciplinary

7    report where someone participated in an assault on a person

8    because they thought he was an informant.  Okay?  And that's

9    what the disciplinary report in the record and the

10   description of the body cam video shows me.  And so that's

11   a -- you know, those are things that you're -- those are

12   choices that you're making each day about how you want to

13   behave and who you want to be.

14        Your mother wrote a beautiful letter, really, a

15   very unusual letter.  And your aunts wrote lovely letters,

16   too, but your mother's letter stands out.  I've read a lot of

17   letters.  Okay.  And it stands out.  I believe you when you

18   say that this isn't the way she raised you.  And she has

19   great hope for you to live differently.  And so the reason

20   that I say this to you, is you have to decide who you want to

21   be and how you want to behave.  And that decision, that's not

22   coming at the end of your prison sentence.  That starts every

23   day.  Each day, you have to decide who you want to be.

24        So when you go back to Wyatt today and tomorrow and

25   the next day, and then when you go on to the Bureau of

1    Prisons, you can decide that, you know, you want to spend

2    your time in jail with people who are harming other people.

3    You can decide to be one of those people in custody who wants

4    to find out, let me see your PSR, let me see your sentencing

5    judgment, let me see your transcript, let me see if you

6    cooperated, let me participate in beatings, or anything else,

7    of someone who you think might have been an informant.  You

8    can do that.  It's not right, it's not lawful, but there are

9    people who do that, I'm sure.  All right.  That's one choice

10   about who you want to be.

11          I know if you asked your mother who does she want

12   you to be, or if I asked your aunts do they want you to do

13   that, they would all tell me no, they don't want that.  But

14   the decision -- you're a grown-up, and the decision is yours.

15          But you could also choose to spend your time

16   differently, both in prison, and then when you get out of

17   prison.  You could choose to spend your time living right.

18   You could spend your time in prison educating yourself,

19   participating in whatever programming that they have that you

20   can participate in.  You could read books -- you could -- for

21   example, you said something that when you were selling the

22   firearm, you were only thinking about the money, right?

23          MR. ROACHE:  (Nods head.)

24          THE COURT:  And you weren't thinking about the

25   people who were getting shot.

1          MR. ROACHE:  No, sir.

2          THE COURT:  And the people who were getting maimed

3     or the people who might die.  Right?  And you weren't

4     thinking about their mothers, right?

5          MR. ROACHE:  (Nods head.)

6          THE COURT:  And I bet -- you've been shot, right?

7          MR. ROACHE:  Yeah.

8          THE COURT:  And so I was thinking what did your

9     mother think the day you were shot, when she got the phone

10    call from somebody that said you're in the hospital, and

11    you've been shot?  I'm sure that she loves you the more --

12    more than the world itself, and that she was terrified and

13    she felt awful and she was scared, and she was worried about

14    what would happen to you.  And, fortunately, you look like

15    you're pretty healthy now, so that's good.

16         But those people who got shot by those guns you

17    sell -- sold, they have mothers, too, and they have aunts and

18    they have brothers and they have sisters and they might have

19    children.  And all those people feel the same way when their

20    loved one was shot as yours.  So you have to decide, do you

21    want to be that person who helps cause that harm, or do you

22    want to be that person who doesn't?  Okay?

23         So when you're in prison, you could read -- you've

24    talk about this realization that you've come to.  You could

25    read books about restorative justice or the harm that comes

1    from the kind of behavior and the kind of things you did.

2    And to -- because you've opened your eyes a little bit, you

3    say, and you could open your eyes more.  Okay?  And if you

4    don't know what to read, you could ask probation or

5    Mr. Hanye, and Mr. Hanye can ask probation.  I'm sure he

6    knows, but if he doesn't, he could ask probation, and they

7    could give you things to look at.

8            So the choice you have is every day, use your time

9    to make the world a better place as best you can, even in

10   prison, and make yourself a little better and live right, or

11   the choice to go the other way.  That's the choice you have.

12   You have that choice, whatever I do here today.

13           And that is a really important choice, because I

14   think, given your family and given your background and given

15   your ability to work, you could -- you could live right.  You

16   could live well.  You could do right.  You could get out,

17   whatever sentence I impose, and you could be there for your

18   son.

19           Because, you are right, that the thing that your

20   son cares the most about is your presence.  And you -- you

21   can't control right now your presence in the next period of

22   time, but you can control what happens to you by how you

23   behave in prison, and then later you can control what happens

24   to you by how you behave.

25           You know where that door goes, right?  The door to

1    the marshals lockup.  And you have the keys to that door,

2    ordinarily.  You've given me the keys now, but when you're

3    done with your prison sentence, you hold those keys.  And

4    then if you live your life the way I bet your mom lives her

5    life -- she has those keys to that door, too.  And do you

6    know where she keeps them?  In her pocket.  She doesn't give

7    them to Mr. Goldworm, and she doesn't give them to me.  And

8    that's smart.  But you have turned those keys over, and you

9    decide what you do.

10          So that's really my message to you, because I think

11   you could do -- live differently and do better.  But you have

12   to do that.  You have to do the work, and you start with who

13   you spend your time with and what choices you make.

14          So turning to the sentence here, there's just a

15   couple of considerations, in a big-picture way, that bear on

16   what sentence to impose.  On the one hand, the selling

17   firearms is really serious.  It's a bad crime.  I don't need

18   to further detail what Mr. Goldworm has described about it.

19   It's further concerning, and given the findings that I've

20   made, the time period that we're talking about, this, first

21   of all, wasn't even on the shorter time period, it wasn't

22   like a one-day event.  But when you add in the longer period

23   of time, it becomes more substantial, both in numbers and in

24   time period, which is --

25          The second is, there's substantial evidence here

that's concerning, that, like -- criminal and bad, which is
the selling drugs.  And there's -- the evidence here is
pretty strong, even though it's not charged, of that.  And
that's what we call an aggravating factor.

And there's the beating of the inmate.

Those are all aggravating factors.

Those all make the recommendation that you make,
Mr. Goldworm -- I understand why you make it, and they make
it reasonable.  It would be reasonable to go to the upper end
of the guideline.

I've thought a lot about that.  The counterpoint is
what you make, Mr. Hanye, which is it's enough.  Like that --
it's enough punishment that there's only so much parsing that
one can do.  And that, at some point, under 3553(a), you have
to say how much is enough for general deterrence, and how
much is enough for specific deterrence.  And so -- and that
makes 57 a reasonable number, as well.

I don't -- I understand why you ask for 46.  It's
not -- it's not unreasonable, under the circumstances.  But
given the countervailing factors that I've described, and the
guideline range, I can't see a below-guideline sentence range
in this case.

So basically, the biggest reason that I'm going to
impose 57, rather than 70, is simply because I think given
the -- that both it's a significant sentence and the increase

1    in the sentence over what he's done.  I think he did

2    12 months on one sentence, and it appears -- and I can't

3    tell, I didn't write down if it was concurrent or not.  It

4    looks like he did close to 12 months on something else.  And

5    it might have been concurrent, and it might have been

6    separate time.  But either way, he's never been in custody

7    once for more than 12 months, and neither has he been in

8    24 months or 22 months.  This sentence is -- it's a big

9    increase.  And so for those reasons, I am sticking with the

10   variance.

11        I will say this, that since I -- you're -- as is

12   your right -- and no problem -- you might appeal the extra

13   four points I applied that you objected to, all the factor --

14   all I'm going to say about that, I guess, two things.  I

15   can't honestly sit here and say for sure, if I were reversed

16   and wrong, that I would impose a 57-month sentence.  I'm

17   not -- I might.  It is certainly possible that I would

18   upwardly vary, given some of the factors that I identified.

19   But I can't sit here and say that I didn't think about it

20   that way, and I can't honestly, just to be perfectly candid

21   with all of you, say for sure that I would do that.  Which, I

22   understand what that does, but I just think that's the case.

23        It's something that I would think about.  I think

24   it unlikely that I would go below the 46.  And I would think

25   about these other factors, bearing on whether I should do 46

1    to 57, but I can't say for sure what I would do.  Because it

2    does change things a little bit when you change the time

3    period of criminal behavior and the amount of guns.

4         So I impose three years of --

5         So pursuant to the Sentencing Reform Act of 1984,

6    and in light of 3553, you're committed to the custody of the

7    Bureau of Prisons for a term of 57 months.

8         You know, neither of you addressed this that

9    probation raised in the PSR about whether this is -- whether

10   the effect of my sentence, vis-a-vis the sentences that will

11   be imposed in these other courts in Lexington County and

12   Kershaw County.  Those are sentences that haven't been

13   imposed yet?

14         THE PROBATION OFFICER:  Your Honor, I'm going to

15   look right now, but I believe they were sentences that he's

16   on probation for and violated the probation by committing

17   this offense.  But let me just look.

18         THE COURT:  Do either of you have a view?

19         MR. GOLDWORM:  I have the same general take as

20   probation, that they were probation violations for this

21   offense.

22         THE PROBATION OFFICER:  It's paragraph 54 and 56.

23   It looks like he -- actually, no, the violation status was

24   before this offense, on at least -- on both of them.  So he

25   was in violation status before he was arrested on the instant

1    offense.

2            MR. GOLDWORM:  And it's just remained open?

3            THE PROBATION OFFICER:  And it's just remained

4    open, yes.

5            THE COURT:  I don't think what I say -- I mean,

6    he's in the federal custody now.  He's going to serve his

7    sentence.  And when he's done with his sentence, if the state

8    of South Carolina wishes him to -- they either can get him on

9    a detainer, if they wish, or if they don't, they can order

10   him to appear.  And it would be a requirement of supervised

11   release to appear.  And nothing that I say will bind those

12   judges.

13           MR. HANYE:  Agreed.

14           THE COURT:  So nothing further to say to that.

15           Do you want me to make any judicial recommendation

16   to the Bureau of Prisons?

17           MR. HANYE:  No, Your Honor.  No.

18           THE COURT:  All right.  Do you want the

19   recommendation that probation suggested, about vocational

20   training?

21           MR. HANYE:  Yes.

22           THE COURT:  All right.  So include that judicial

23   recommendation.

24           I'm imposing a three-year term of supervised

25   release, and within 72 hours of release, you'll report in

1    person to the district to which you're released.

2            I impose no fine, as I find that you don't have the

3    financial ability to pay a fine.

4            Is there forfeiture here?

5            MR. GOLDWORM:  It's the firearms in the indictment,

6    Your Honor.

7            THE COURT:  You don't object to that, do you?

8            MR. HANYE:  No.

9            THE COURT:  I allow the forfeiture to the extent

10   charged in the indictment.

11           Have you reviewed the conditions of supervision

12   that are listed on page 31 and page 32, such that you waive

13   reading of them in their entirety?

14           MR. HANYE:  Yes, Your Honor.

15           THE COURT:  I impose the mandatory conditions, 1,

16   2, 3, and 4, on page 31.

17           The primary one to think about, Mr. Roache, is when

18   you're on supervised release, you can't commit another local,

19   state, or federal crime.

20           I impose the standard conditions the court has

21   adopted from Section 5D1.3(c).  And I'm adding --

22           There are no special conditions recommended by

23   probation.

24           I'm imposing one, which is a -- that I recommend --

25   this is what the condition is:  I recommend that probation

1    discuss with Mr. Roache participating in the court's

2    restorative justice program.

3         You do not have to participate, and that will be up

4    to you.  So probation has to discuss it with him.  If you

5    discuss it with probation, you've satisfied the condition.

6         I think you would benefit from meeting with people

7    in a group, not only people who sold guns and possessed guns,

8    but people who have been harmed by drugs and guns.  But

9    that's not a requirement to do it, it's just a requirement to

10   discuss with probation.

11        And then there's the mandatory special assessment

12   of $100.

13        You have the right to appeal from the sentence and

14   the conviction, the determination that I've made, including

15   the one that Mr. Hanye objected to and I overruled, his

16   objection and various aspects of the sentence and the

17   conviction.  Any notice of appeal is due within 14 days of

18   today.

19        If you can't afford to file a notice of appeal with

20   the clerk, you can ask the clerk to prepare and file one on

21   your behalf.

22        You can discuss with Mr. Hanye --

23        There isn't a waiver?  There's no plea agreement

24   here, right?

25             MR. HANYE:  Correct.

1          MR. GOLDWORM:  There's no plea.

2          THE COURT:  Anything else from probation?

3          THE PROBATION OFFICER:  No.  Thank you, Your Honor.

4          THE COURT:  Anything else, Mr. Goldworm?

5          MR. GOLDWORM:  Not from the government.

6          THE COURT:  Anything else, Mr. Hanye?

7          MR. HANYE:  Your honor, just for one last time, I'd

8     restate my guidelines objections for the reasons that were

9     argued.

10          And also, for the Court's consideration of that pre

11     2023 behavior under 3553(a), which I heard the Court

12     considered that, as well, the argument being, if there's

13     insufficient evidence to prove that Mr. Roache was connected,

14     then it can't be used against him, within the Court's

15     discretion, either.

16          THE COURT:  Right.  So two things I say:

17          One, all of your rights are preserved as to all of

18     your objections.

19          Two, the reason that I said what I said is I do

20     think, one, if -- if you prevail on the -- if you appeal and

21     prevail on the guideline issue, it is -- changes the

22     guidelines, obviously, and it changes the range.  And the --

23     but it changes the 3553 calculus, I think, to some degree,

24     because part of what I -- I think is relevant to 3553

25     calculus is the duration of time that he was involved in the

1    criminal conduct, and that brings in trafficking firearms in

2    2021; whereas, otherwise, the trafficking firearms is just in

3    2023.

4         And so I think it is a -- I overrule the objection

5    with respect to 3553, given what I found, but I do think that

6    if it goes, it goes -- then I wouldn't be considering

7    trafficking in 2021.  And that's why I say these other

8    factors that were concerning are there, and I might -- as I

9    sit here now, I think I would -- I would not go below the

10   high end of the lower range, given those concerning factors.

11   I would entertain an upward variance.  But I can't sit here

12   and say I would vary upward to the 57 months.  I might.  I'm

13   just not sure.  I would have to think about it and hear from

14   all of you.

15         But all of your rights are preserved.

16         MR. HANYE:  Understood.  Thank you.

17         THE COURT:  We stand in recess.  Thank you.

18         (Court in recess at 12:12 p.m.)

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                          Dated this 3rd day of April, 2025.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20          _____
                 Rachel M. Lopez, CRR
21               Official Court Reporter

22

23

24

25